**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| INTERNATIONALE KAPITALANLAGEGESELLSCHAFT mbH, <br><br> Plaintiff, <br><br> v. <br><br> PETRÓLEO BRASILEIRO S.A.-PETROBRAS, PETROBRAS GLOBAL FINANCE B.V., MARIA DAS GRAÇAS SILVA FOSTER, JOSÉ SERGIO GABRIELLI DE AZEVEDO, ALMIR GUILHERME BARBASSA, DANIEL LIMA DE OLIVEIRA, JOSÉ RAIMUNDO BRANDÃO PEREIRA, SÉRVIO TÚLIO DA ROSA TINOCO, PAULO JOSÉ ALVES, GUSTAVO TARDIN BARBOSA, ALEXANDRE QUINTÃO FERNANDES, MARCOS ANTONIO ZACARIAS, CORNELIS FRANCISCUS JOZEF LOOMAN, THEODORE MARSHALL HELMS, BB SECURITIES LTD., CITIGROUP GLOBAL MARKETS INC., ITAÚ BBA USA SECURITIES, INC., J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC, MITSUBISHI UFJ SECURITIES (USA), INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, STANDARD CHARTERED BANK, BANK OF CHINA (HONG KONG) LIMITED, BANCO BRADESCO BBI S.A., BANCA IMI S.P.A., and SCOTIA CAPITAL (USA) INC., <br><br> Defendants. | No. _____ <br><br> **COMPLAINT** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

# TABLE OF CONTENTS

I.     NATURE OF ACTION .......................................................................................... 1

II.    FACTUAL OVERVIEW AND SUMMARY OF ALLEGATIONS.................................. 3

III.   RELEVANT SECURITIES.................................................................................... 5

    A.   PETROBRAS EQUITY ................................................................................ 6

    B.   PETROBRAS DEBT – THE 2003 NOTES, 2006 NOTES, 2007 NOTES,
        FEBRUARY 2009 NOTES AND OCTOBER 2009 NOTES ................................ 6

    C.   PETROBRAS DEBT – THE 2011 NOTES AND 2012 NOTES ......................... 9

    D.   PETROBRAS DEBT – THE 2013 AND 2014 NOTES ................................. 10

IV.    PARTIES ........................................................................................................ 12

    A.   PLAINTIFF ............................................................................................ 12

    B.   SECURITIES ACT DEFENDANTS ............................................................. 13

        1.   The Company ............................................................................ 13

        2.   The Officer and Director Defendants ....................................... 13

        3.   The Underwriter Defendants...................................................... 15

    C.   EXCHANGE ACT DEFENDANTS ............................................................. 18

V.     JURISDICTION AND VENUE .......................................................................... 18

VI.    SUMMARY OF SUBSTANTIVE ALLEGATIONS.................................................. 19

    A.   BACKGROUND OF PETROBRAS................................................................ 19

    B.   A BRIBERY SCANDAL ENGULFS PETROBRAS ......................................... 20

        1.   Operation Car Wash Uncovers An Enormous Bribery And
            Corruption Scheme Implicating Top Petrobras Officials ......... 20

        2.   An Independent Member Of The Petrobras Board Votes Against
            Approval Of The Company's 2013 Financial Statements ........ 26

        3.   The Abreu e Lima Refinery, Comperj Petrochemical Complex And
            Other Major Projects Are Implicated In The Fraud .................. 27

        4.   Petrobras' Most Senior Executives Knew Of The Fraud.......... 30

        5.   Petrobras Is Subject To Far-Ranging Investigations................. 34

    C.   PETROBRAS' AUDITOR REFUSES TO APPROVE ITS FINANCIAL STATEMENTS
        FOR THE THIRD QUARTER OF 2014 DUE TO CONCERNS OVER THE BRIBERY
        SCHEME ................................................................................................ 36

    D.   PETROBRAS ADMITS THAT THE BRIBERY SCHEME CAUSED ITS ASSET
        VALUATIONS TO BE INFLATED .............................................................. 37

    E.   PETROBRAS MANAGEMENT RESIGNS *EN MASSE* ................................... 41

F.   PETROBRAS WRITES OFF $2.5 BILLION IN BRIBE AND CORRUPTION-
RELATED PAYMENTS THAT WERE INAPPROPRIATELY CAPITALIZED ..................... 42

VII.   PETROBRAS' VIOLATIONS OF ACCOUNTING STANDARDS ............................. 45

A.   2009-2010 – US GAAP VIOLATIONS ................................................. 46

B.   2011-2014 – IFRS VIOLATIONS ...................................................... 48

VIII.   DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS ...................... 52

A.   FALSE STATEMENTS AND OMISSIONS RELEVANT TO
EXCHANGE ACT CLAIMS ................................................................ 52

1.   May 20, 2010 – 2009 Form 20-F ........................................ 52

2.   August 24-25, 2010 – Press Release And Form 6-K Announcing
Financial Results For The Second Quarter Of 2010 ................................ 54

3.   October 8, 2010 – Facts and Data Post Regarding Overpricing .............. 55

4.   November 9, 2010 – Facts and Data Post Regarding The Repar and
Abreu e Lima Refineries .......................................................... 56

5.   November 23 and 24, 2010 – Press Release And Form 6-K
Announcing Financial Results For The Third Quarter Of 2010 .............. 57

6.   January 18, 2011 – Prospectus Supplement Offering The 2011
Notes ...................................................................................... 57

7.   March 15, 2011 – Press Release Announcing 2010 Financial
Results .................................................................................... 58

8.   May 24 and 26, 2011 – Press Release And Form 6-K Announcing
Financial Results For The First Quarter Of 2011 ................................... 58

9.   May 26, 2011 – 2010 Form 20-F ........................................ 59

10.   June 6, 2011 – 2010 Sustainability Report ................................ 59

11.   August 14 and 25, 2011 – Press Release And Form 6-K
Announcing Financial Results For The Second Quarter Of 2011 ........... 60

12.   November 22, 2011 – Press Release And Form 6-K Announcing
Financial Results For The Third Quarter Of 2011 ................................ 60

13.   February 3, 2012 – Prospectus Supplement Offering The 2012
Notes ...................................................................................... 61

14.   February 28 and 29, 2012 – Press Release And Form 6-K
Announcing 2011 Financial Results ........................................... 61

15.   April 2, 2012 – 2011 Form 20-F ........................................ 62

16.   May 15, 2012 – Press Release And Form 6-K Announcing
Financial Results For The First Quarter Of 2012 ................................ 62

17.   June 21, 2012 – 2011 Sustainability Report ............................... 63

18. August 3, 2012 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2012 ................................. 64

19. August 29, 2012 – 2012 Registration Statement ...................................... 65

20. October 26, 2012 – Press Release And Form 6-K Announcing Financial Results For The Third Quarter Of 2012 .................................. 66

21. December 29, 2012 – Facts and Data Post Regarding Internal Controls .................................................................................................. 66

22. January 7, 2013 – Facts and Data Posts Regarding The Comperj Refinery ................................................................................................ 67

23. February 4, 2013 – Press Release And Form 6-K Announcing 2012 Financial Results .................................................................................... 67

24. April 26, 2013 – Press Release And Form 6-K Announcing Financial Results For The First Quarter Of 2013 .................................... 68

25. April 29, 2013 – 2012 Form 20-F ......................................................... 68

26. May 15, 2013 – Prospectus Supplement For The 2013 Notes ................. 69

27. May 2013 – 2012 Sustainability Report .................................................. 70

28. August 7, 2013 – Facts and Data Posting Regarding The Acquisition of the Pasadena Refinery .......................................................... 71

29. August 9, 2013 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2013 ............................... 72

30. October 25, 2013 – Press Release And Form 6-K Announcing Financial Results For The Third Quarter Of 2013 .................................. 72

31. February 25, 2014 – Press Release And Form 6-K Announcing 2013 Financial Results .............................................................................. 73

32. March 11, 2014 – Prospectus Supplement For 2014 Notes ..................... 74

33. April 30, 2014 – 2013 Form 20-F .......................................................... 75

34. May 2014 – 2013 Sustainability Report ................................................. 76

35. May 9, 2014 – Press Release And Form 6-K Announcing Financial Results For The First Quarter Of 2014 ..................................... 77

36. May 10, 2014 – Facts and Data Post Regarding SBM Offshore ............. 78

37. May 19, 2014 – Facts and Data Post Regarding The Abreu e Lima Refinery ................................................................................................ 79

38. May 23, 2014 – Facts and Data Post Regarding Petrobras Payment Procedures And The Pasadena Refinery Acquisition ............................. 79

39. July 12, 2014 – Facts and Data Posting Regarding The Pasadena Refinery And SBM Offshore ................................................................. 81

iii

40. August 8, 2014 – Press Release And Form 6-K Announcing Financial Results For The Second Quarter Of 2014 ................................. 81

B. FALSE STATEMENTS RELEVANT TO SECURITIES ACT CLAIMS ............................. 82

1. False Statements And Omissions In The Offering Documents For The 2013 Notes ................................................................................. 82

2. False Statements And Omissions In The Offering Documents For The 2014 Notes ................................................................................. 83

IX. THE TRUTH EMERGES, LEADING TO LARGE DECLINES IN THE PRICES OF PETROBRAS SECURITIES ................................................................. 84

X. THE EXCHANGE ACT DEFENDANTS ACTED WITH SCIENTER ...................... 108

A. PETROBRAS, PIFCO AND PGF ........................................................... 108

B. GABRIELLI ......................................................................................... 110

C. FOSTER ............................................................................................. 112

D. BARBASSA ......................................................................................... 113

XI. PLAINTIFF RELIED UPON DEFENDANTS' MISREPRESENTATIONS TO PLAINTIFF'S DETRIMENT ........................................................................ 114

A. PRESUMPTION OF RELIANCE: THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES ........................................................................ 116

B. NO SAFE HARBOR .............................................................................. 117

XII. PLAINTIFF HAS SUFFERED LOSSES AS A RESULT OF ITS PURCHASES OF PETROBRAS SECURITIES ................................................................. 118

XIII. THE ARBITRATION CLAUSE IN PETROBRAS' BYLAWS IS INAPPLICABLE TO PLAINTIFF ............................................................... 119

XIV. CAUSES OF ACTION ............................................................................. 120

PRAYER FOR RELIEF .......................................................................... 129

JURY TRIAL DEMANDED ...................................................................... 129

Plaintiff Internationale Kapitalanlagegesellschaft mbH ("Plaintiff" or "INKA"), by and through its undersigned counsel, allege the following based upon personal knowledge as to Plaintiff's own acts and upon information and belief as to all other matters.   Plaintiff's allegations are based on the investigation conducted by Plaintiff's undersigned attorneys, which included, among other things: (1) review and analysis of documents filed with the United States Securities and Exchange Commission ("SEC") by Petróleo Brasileiro S.A.-Petrobras ("Petrobras" or the "Company") and its wholly-owned subsidiaries Petrobras International Finance Company S.A. ("PifCo") and Petrobras Global Finance B.V. ("PGF"); (2) review and analysis of press releases and reports issued by and disseminated by Petrobras; (3) review of international and domestic media coverage of Petrobras; and (4) review of other publicly available information concerning Petrobras.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.       **NATURE OF ACTION**

1.       This action is brought pursuant to the Securities Exchange Act of 1934 (the ("Exchange Act") and the Securities Act of 1933 (the "Securities Act").   Plaintiff purchased or otherwise acquired the securities of Petrobras, including debt securities issued by PifCo and PGF, on the New York Stock Exchange (the "NYSE") between August 19, 2010 and May 13, 2015, inclusive (the "Relevant Period").

2.       Plaintiff's Exchange Act claims allege that certain of the defendants engaged in a fraudulent scheme that artificially inflated the price of Petrobras securities, including the debt securities issued by PifCo and/or PGF, during the Relevant Period.   Plaintiff's Exchange Act claims are brought in connection with Petrobras debt securities and American Depositary Shares

1

("ADS").  Petrobras common ADS trade on the NYSE under the symbol PBR, and its preferred

ADS trade on the NYSE under the symbol PBR/A.

3.     Plaintiff's Securities Act claims are based solely on strict liability and negligence,

and not upon any reckless or intentionally fraudulent conduct by or on behalf of Defendants (as

defined below in ¶77).  These claims do not allege, arise from, or sound in, fraud.  Plaintiff

specifically disclaims any allegation of fraud, scienter, or recklessness with respect to its

Securities Act claims.

4.     Plaintiff's Securities Act claims are brought in connection with certain debt

securities issued by PifCo and/or PGF pursuant and/or traceable to two public offerings

registered in the United States.  In a debt offering on or about May 15, 2013 (the "2013

Offering"), PGF sold approximately $11 billion in notes at six sets of interest rate and maturity

terms (the "2013 Notes").  PGF sold approximately $8.5 billion in notes at six sets of interest

rate and maturity terms (the "2014 Notes") in a second debt offering on or about March 11, 2014

(the "2014 Offering" and, together with the 2013 Offering, the "Offerings").

5.     The claims asserted herein arise from a series of false statements of material fact

and omissions of material adverse information made by Defendants throughout the Relevant

Period, concerning: (1) the value of Petrobras' assets; (2) the Company's periodic expenses and

net income; (3) the Company's anti-bribery and anti-corruption policies; and (4) whether the

Company suffered from material weaknesses in its disclosure controls and procedures and its

internal controls over financial reporting.  When the truth about these matters was revealed

through a series of corrective disclosures, the market value of Petrobras, PifCo and PGF

securities purchased by Plaintiff declined sharply, causing Plaintiff to suffer losses.

## II.   FACTUAL OVERVIEW AND SUMMARY OF ALLEGATIONS

6.   This case revolves around a prolonged, pervasive, multi-billion dollar bribery and corruption scheme involving top Petrobras executives, major contractors, and corrupt officials of the Brazilian government (which is Petrobras' controlling shareholder).  Beginning around 2005 and continuing into the Relevant Period, the Company engaged in a scheme whereby contractors paid bribes to Petrobras executives and others in exchange for the award of lucrative oil and gas construction contracts.  Some of the bribes were passed on to Brazilian politicians and political parties.  Petrobras then paid the contractors inflated amounts under the contracts in order to repay them for the bribes.  According to a money launderer who participated in the scheme, and whose testimony has been central to the Brazilian government investigation, both Petrobras' CEO and the current President of Brazil (who was the Chairman of the Company from 2003 to 2010) knew of and understood the scheme.  When the fraud was finally revealed beginning in May 2014, it sent shock waves through the Brazilian government and economy, and caused Petrobras' market capitalization to plummet.

7.   Throughout the Relevant Period, the Company specifically, unequivocally and repeatedly denied that it was involved in any corrupt practices, claiming that "Petrobras does not make contributions to political parties or political campaigns of candidates to elected positions" and that the Company "is not involved in corruption."  These statements were material to investors who were concerned about the potential for impropriety given the close relationship between the Brazilian government and the Company.

8.   Furthermore, Petrobras capitalized its bribery and corruption-related payments, treating them as costs related to the development of oil and gas infrastructure and recording them on the Company's balance sheet as representing part of the value of the acquired assets.  Petrobras then used the bribery-inflated asset values in calculating depreciation expenses and net

income.   Yet, during the Relevant Period, Petrobras asserted that it prepared its financial statements in accordance with Generally Accepted Accounting Principles ("GAAP") or International Financial Reporting Standards ("IFRS"), claiming that its assets had values equal to the reported costs incurred in their acquisition or construction.

9.    Petrobras' reported asset values were important information for Plaintiff and other purchasers of the Petrobras, PifCo, and PGF securities because these metrics were understood to represent the fair value of the Company's fixed assets.   Market participants including rating agencies, analysts and investors relied upon the accuracy of these figures.

10.    After months of delay, on April 22, 2015, Petrobras released its audited financial statements for 2014, in which it wrote off *$2.5 billion* in bribery and corruption-related payments that were incorrectly capitalized.   The Company also announced an impairment charge of *$11.6 billion* on its Abreu e Lima and Complexo Petroquimico do Rio de Janeiro ("Comperj") refineries.   Thus, it is clear that the value of key Petrobras assets were massively overstated.   It is not, however, clear whether these adjustments accurately capture the full extent of the overstatement and the reasons for it.   None of the Board's independent members voted to affirm the audited financial statements, citing limitations on the information they were provided with, the time they were given to review it, and their concerns about the methodology used in analyzing the write-down.   One stated that his meetings with management "were not sufficient to convince me that the balance sheet of Petrobras reflects accurately the financial reality of the Company."

11.    Throughout the Relevant Period, Petrobras issued public statements, including financial statements filed with the SEC, setting forth, among other things: (1) the Company's asset values; (2) the Company's periodic expenses and net income; (3) statements regarding the

4

Company's anti-corruption policies and practices; and (4) certifications that the Company did not suffer from a material weakness in its disclosure controls and procedures or its internal controls over financial reporting.

12.     These statements were false, in that: (1) the Company's asset values had been inflated by the fraudulent practice of incorporating bribe and corruption-related expenses to contractors when capitalizing asset values on the Company's balance sheet, violating GAAP and IFRS; (2) the Company's expenses were understated and its income overstated due to its practice of capitalizing, rather than expensing, bribe and corruption-related expenses; (3) the Company was involved in corrupt practices and did make payments to political candidates; and (4) the Company suffered from material weaknesses in its disclosure controls and internal controls over financial reporting.  As a result of these false statements and omissions, the prices of Petrobras securities were artificially inflated during the Relevant Period.

13.     As a result of Defendants' materially false and/or misleading statements and omissions: (1) Petrobras, PifCo, and PGF securities traded at artificially inflated prices during the Relevant Period; and (2) Plaintiff purchased those securities at artificially inflated prices. When the truth about these matters became known to investors, the price of Petrobras, PifCo, and PGF securities fell.  These price declines caused significant losses and damages to Plaintiff.

**III.     RELEVANT SECURITIES**

14.     Petrobras was incorporated in 1953 to conduct the Brazilian government's hydrocarbon business.  While the Company was opened to private equity ownership in the late 1990s, the Brazilian government still owned 28.67% of its outstanding capital stock and 50.26% of its voting shares as of December 31, 2013.  It is involved in hydrocarbon-related businesses including exploration, development, production, refining, logistics, transportation, and trading, as well as production of biofuels.

5

**A.  PETROBRAS EQUITY**

15.    During the Relevant Period, Petrobras common and preferred ADS were listed on the NYSE.  Each Petrobras ADS represents two shares of common or preferred stock.

**B.  PETROBRAS DEBT – THE 2003 NOTES, 2006 NOTES, 2007 NOTES, FEBRUARY 2009 NOTES AND OCTOBER 2009 NOTES**

16.    During the Relevant Period, Plaintiff and/or its agents bought debt that Petrobras issued through its wholly-owned finance subsidiaries PGF and PifCo.  On August 14, 2002, Petrobras and PifCo filed on Form F-3/A (the "2002 Registration Statement") an amendment to a previous registration of securities.  The 2002 Registration Statement registered an aggregate amount of up to $8.0 billion in securities to be offered.  The 2002 Registration Statement states that "[w]e have agreed that New York law governs the indenture and the debt securities.  We have filed a copy of the Petrobras indenture and [PifCo] indenture with the SEC as exhibits to our registration statement.  We have consented to the non-exclusive jurisdiction of any U.S. federal court sitting in the borough of Manhattan in the City of New York, New York[.]"

17.    On December 5, 2003, PifCo filed a prospectus supplement on Form 424B2 (the "2003 Prospectus" and together with the 2002 Registration Statement, the "2003 Offering Documents") for the offer and sale of $750 million in debt securities pursuant to the 2002 Registration Statement.

18.    Pursuant to the 2003 Offering Documents, Petrobras and PifCo offered $750 million of notes paying 8.375% due in 2018 (CUSIP 71645WAH4) (the "2003 Notes").

19.    On July 15, 2005, Petrobras and PifCo filed on Form F-3/A (the "2005 Registration Statement") an amendment to a previous registration of securities.  The 2005 Registration Statement registered an aggregate amount of up to $6.5 billion in securities to be offered.  The 2005 Registration Statement states that "[w]e have agreed that New York law

6

governs the indenture and the debt securities.  We have filed a copy of the Petrobras indenture

and [PifCo] indenture with the SEC as exhibits to our registration statement.  We have consented

to the non-exclusive jurisdiction of any U.S. federal court sitting in the borough of Manhattan in

the City of New York, New York[.]"

20.    On October 2, 2006, PifCo filed a prospectus supplement on Form 424B2 (the

"2006 Prospectus" and together with the 2005 Registration Statement, the "2006 Offering

Documents") for the offer and sale of $500 million in debt securities pursuant to the 2005

Registration Statement.

21.    Pursuant to the 2006 Offering Documents, Petrobras and PifCo offered $500

million of notes paying 6.125% due in 2016 (CUSIP 71645WAL5) (the "2006 Notes").

22.    Additionally, on December 18, 2006, Petrobras and PifCo filed a registration

statement on Form F-3ASR (the "2006 Registration Statement"), whereby they registered "an

indeterminate amount of securities for offer and sale from time to time at indeterminate offering

prices."  The 2006 Registration Statement states that "[w]e have agreed that New York law

governs the indenture and the debt securities.  We have filed a copy of the Petrobras indenture

and [PifCo] indenture with the SEC as exhibits to our registration statement.  We have consented

to the non-exclusive jurisdiction of any U.S. federal court sitting in the borough of Manhattan in

the City of New York, New York[.]"

23.    On October 31, 2007, PifCo filed a prospectus supplement on Form 424B2 (the

"2007 Prospectus" and together with the 2006 Registration Statement, the "2007 Offering

Documents") for the offer and sale of $1 billion in debt securities, pursuant to the 2006

Registration Statement.

24.     Pursuant to the 2007 Offering Documents, Petrobras and PifCo offered $1 billion of notes paying 5.875% due in 2018 (CUSIP 71645WAM3) (the "2007 Notes.").

25.     On January 10, 2008, PifCo filed a prospectus supplement on Form 424B2 (the "2008 Prospectus" and together with the 2006 Registration Statement, the "2008 Offering Documents") for the offer and sale of one series of notes, pursuant to the 2006 Registration Statement.

26.     Pursuant to the 2008 Offering Documents, Petrobras and PifCo offered a $750 million re-opening of the 2007 Notes.

27.     On February 5, 2009, PifCo filed a prospectus supplement on Form 424B2 (the "February 2009 Prospectus" and together with the 2006 Registration Statement, the "February 2009 Offering Documents) for the offer and sale of $1.5 billion in debt securities, pursuant to the 2006 Registration Statement.

28.     Pursuant to the February 2009 Offering Documents, Petrobras and PifCo offered $1.5 billion in notes paying 7.875% due in March 2019 (CUSIP 71645WAN1) (the "February 2009 Notes").

29.     On July 2, 2009, PifCo filed a prospectus supplement on Form 424B2 (the "July 2009 Prospectus" and together with the 2006 Registration Statement, the "July 2009 Offering Documents") for the offer and sale of one series of notes, pursuant to the 2006 Registration Statement.

30.     Pursuant to the July 2009 Offering Documents, Petrobras and PifCo offered a $1.25 billion re-opening of the February 2009 Notes.

31.     On October 26, 2009, PifCo filed a prospectus supplement on Form 424B2 (the "October 2009 Prospectus" and together with the 2006 Registration Statement, the "October

2009 Offering Documents") for the offer and sale of $4 billion in debt securities in two different series of notes, pursuant to the 2006 Registration Statement.

32.     Pursuant to the 2009 Offering Documents, Petrobras and PifCo offered two series of notes: (1) $2.5 billion of notes paying 5.75% due in 2020 (CUSIP71645WAP6); and (2) $1.5 billion of notes paying 6.875% due in 2040 (CUSIP 71645WAQ4) (collectively the "October 2009 Notes").

### C.     PETROBRAS DEBT – THE 2011 NOTES AND 2012 NOTES

33.     On December 11, 2009, Petrobras and PifCo filed a registration statement on Form F-3ASR (the "2009 Registration Statement"), whereby they registered "an indeterminate amount of securities for offer and sale from time to time at indeterminate offering prices." The 2009 Registration Statement states that "[w]e have agreed that New York law governs the indenture and the debt securities. We have filed a copy of the Petrobras indenture and PifCo indenture with the SEC as exhibits to our registration statement. We have consented to the non-exclusive jurisdiction of any U.S. federal court sitting in the borough of Manhattan in the City of New York, New York[.]"

34.     On January 21, 2011, PifCo filed a prospectus supplement on Form 424B2 (the "2011 Prospectus" and together with the 2009 Registration Statement, the "2011 Offering Documents") for the offer and sale of $6 billion in debt securities in three different series of notes, pursuant to the 2009 Registration Statement.

35.     Pursuant to the 2011 Offering Documents, Petrobras and PifCo offered three series of notes: (1) $2.5 billion of notes paying 5.375% due in 2021 (CUSIP 71645WAR2); (2) $2.5 billion of notes paying 3.875% due in 2016 (CUSIP 71645WAT8); and (3) $1 billion of notes paying $6.750% due in 2041 (CUSIP 71645WAS0) (collectively, the "2011 Notes").

36.     On February 3, 2012, PifCo filed a prospectus supplement on Form 424B2 (the "2012 Prospectus" and together with the 2009 Registration Statement, the "2012 Offering Documents") for the offer and sale of $7 billion in debt securities in four different series of notes, pursuant to the 2009 Registration Statement.

37.     Pursuant to the 2012 Offering Documents, Petrobras and PifCo offered four series of notes: (1) a $2.75 billion re-opening of notes first offered on January 27, 2011 paying 5.375% due in 2021 (CUSIP 71645WAR2); (2) a $1.25 billion re-opening of notes first offered on January 27, 2011 paying 6.750% due in 2041 (CUSIP 71645WAS0); (3) $1.25 billion of notes paying 2.875% due in 2015 (CUSIP 71645WAV3); and (4) $1.75 billion of notes paying 3.500% due in 2017 (CUSIP 71645WAU5) (collectively, the "2012 Notes").

**D.     PETROBRAS DEBT – THE 2013 AND 2014 NOTES**

38.     On August 29, 2012, Petrobras, PifCo, and PGF filed a registration statement on Form F-3ASR (the "2012 Registration Statement"), whereby they again registered "an indeterminate amount of securities for offer and sale from time to time at indeterminate offering prices." The 2012 Registration Statement states that, "We have agreed that New York law governs the indenture and the debt securities. We have filed a copy of the Petrobras, PifCo and PGF indentures as exhibits to our registration statement. We have consented to the non-exclusive jurisdiction of any U.S. federal court sitting in the borough of Manhattan in the City of New York, New York[.]" The 2012 Registration Statement included a prospectus that expressly incorporated by reference the following documents, amongst others:

a)     the combined Petrobras and PifCo Annual Report on Form 20-F for the year ended December 31, 2011, filed with the SEC on March 30, 2012, and its amendment on Form 20-F/A, filed with the SEC on July 9, 2012;

10

b)    the Petrobras Report on Form 6-K filed with the SEC on August 10, 2012, containing financial information for the six-month periods ended June 30, 2012 and 2011; and

c)    "Any future filings of Petrobras on Form 20-F made with the SEC after the date of this prospectus and prior to the termination of the offering of the securities offered by this prospectus . . . ."

39.    On May 15, 2013, PGF filed a prospectus supplement on Form 424B2 (the "2013 Prospectus" and together with the 2012 Registration Statement, the "2013 Offering Documents") for the offer and sale of $11 billion in debt securities in six different series of notes, pursuant to the 2012 Registration Statement.

40.    Pursuant to the 2013 Offering Documents, Petrobras and PGF offered six series of notes: (1) $1.25 billion of notes paying 2.00% due in 2016 (CUSIP 71647NAC3); (2) $2 billion of notes paying 3.00% due in 2019 (CUSIP 71647NAB5); (3) $3.5 billion of notes paying 4.375% due in 2023 (CUSIP 71647NAF6); (4) $1.75 billion of notes paying 5.625% due in 2043 (CUSIP 71647NAA7); (5) $1 billion of floating-rate notes due in 2016 (CUSIP 71647NAD1); and (6) $1.5 billion of floating-rate notes due in 2019 (CUSIP 71647NAE9).

41.    On March 11, 2014, PGF filed a prospectus supplement on Form 424B2 (the "2014 Prospectus" and together with the 2012 Registration Statement, the "2014 Offering Documents") for the offer and sale of $8.1 billion of debt securities in six different series of notes, pursuant to the 2012 Registration Statement.

42.    Pursuant to the 2014 Offering Documents, Petrobras and PGF offered six series of notes: (1) $1.6 billion of notes paying 3.250% due in 2017 (CUSIP 71647NAG4); (2) $1.5 billion of notes paying 4.875% due in 2020 (CUSIP 71647NAH2); (3) $2.5 billion of notes paying

6.250% due in 2024 (CUSIP 71647NAM1); (4) $1 billion of notes paying 7.250% due in 2044 (CUSIP 71647NAK5); (5) $1 billion of floating-rate notes due in 2017 (CUSIP 71647NAJ8); and (6) $500 million of floating-rate notes due in 2020 (CUSIP 71647NAL3).

43.     The 2003 Notes, 2006 Notes, 2007 Notes, February 2009 Notes, October 2009 Notes, 2011 Notes, 2012 Notes, 2013 Notes, and 2014 Notes are hereinafter collectively referred to as the "Notes." The Notes are fully and unconditionally guaranteed by Petrobras.

## IV.    PARTIES

### A.    PLAINTIFF

44.     Plaintiff is registered at Yorckstraße 21, 40476 Düsseldorf, Germany as a German fund management company with assets under management of €200 billion. INKA functions as a "Master KAG" under German investment company law and is acting on behalf and in the sole interest of their (non-legal entity) investment funds based on their fiduciary duties to their clients. It is the only corporate entity with standing to assert the claims as the funds administered and managed by INKA are registered funds under German law but without legal personality.

45.     Plaintiff made purchases of Petrobras common ADS, Petrobras preferred ADS, 2003 Notes (CUSIP 71645WAH4), 2006 Notes (CUSIP 71645WAL5), 2007 Notes (CUSIP 71645WAM3), February 2009 Notes (CUSIP 71645WAN1), October 2009 Notes (CUSIP 71645WAP6 and 71645WAQ4), 2011 Notes (CUSIPs 71645WAR2, 71645WAS0, and 71645WAT8), 2012 Notes (CUSIPs 71645WAR2 and 71645WAS0), 2013 Notes (CUSIP 71647NAA7, 71647NAB5, 71647NAC3, 71647NAD1, 71647NAE9, and 71647NAF6), and 2014 Notes (CUSIP 71647NAG4, 71647NAH2, 71647NAJ8, 71647NAK5, 71647NAL3, and 71647NAM1) at artificially inflated prices during the Relevant Period and suffered damages thereby. At the time Plaintiff purchased these securities, Plaintiff did so in reliance on the Petrobras public statements discussed in § VIII, *infra*.

12

### B.    SECURITIES ACT DEFENDANTS

#### 1.    The Company

46.    Defendant Petrobras is a corporation organized under Brazilian law.  Its principal executive offices are located at Avenida República do Chile, No. 65, 23rd Floor, 20031-912, Rio de Janeiro, Brazil.  Petrobras also has an office at 570 Lexington Avenue, 43rd Floor, New York, New York 10022.

47.    Defendant PGF is a wholly-owned finance subsidiary of Petrobras incorporated in The Netherlands.  Its principal executive offices are located at Weenapoint Toren A, Weena 722, 3014 DA Rotterdam, The Netherlands.

48.    PifCo was a wholly-owned finance subsidiary of Petrobras.   Between the beginning of the Relevant Period and August 9, 2013, PifCo was incorporated in the Cayman Islands with its principal executive offices located at 4th Floor, Harbour Place, 103 South Church Street, P.O. Box I 034GT-BWI, George Town, Grand Cayman, Cayman Islands.  On August 9, 2013, PifCo completed a transfer of domicile, registering in Luxembourg with principal executive offices at 40, Avenue Monterey, 2163 Luxembourg.  On December 16, 2013, certain assets and liabilities of PifCo were spun off to Petrobras.  On February 12, 2014, PGF acquired the outstanding shares of PifCo as an initial step for the merger of PifCo into PGF.   On December 29, 2014, the merger of PifCo into PGF was completed and PifCo's separate corporate existence was extinguished.  All allegations against PifCo are made against PGF as the corporate successor of PifCo.

#### 2.    The Officer and Director Defendants

49.    Defendant José Sergio Gabrielli de Azevedo ("Gabrielli") served as Chief Executive Officer ("CEO") of Petrobras during the Relevant Period, and signed the 2009 and 2010 Forms 20-F.  Gabrielli resigned as CEO on or around January 23, 2012.

50.     Defendant Maria das Graças Silva Foster ("Foster") served as CEO of Petrobras during the Relevant Period, beginning on or around February 13, 2012, and signed the prospectus included in the 2012 Registration Statement, as well as the 2011, 2012, and 2013 Forms 20-F.  Foster resigned as CEO on or around February 4, 2015.

51.     Defendant Almir Guilherme Barbassa ("Barbassa") served as Chief Financial Officer ("CFO") of Petrobras during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement, as well as the 2010, 2011, 2012, and 2013 Forms 20-F.

52.     Defendant Daniel Lima de Oliveira ("Oliveira") served as CEO and Chairman of PifCo during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement, as well as the 2010, 2011, and 2012 Forms 20-F.

53.     Defendant José Raimundo Brandão Pereira served as a Director of PifCo during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

54.     Defendant Sérvio Túlio da Rosa Tinoco ("Tinoco") served as CFO of PifCo during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement, as well as the 2010, 2011, and 2012 Forms 20-F.

55.     Defendant Paulo José Alves served as the Chief Accounting Officer of PifCo during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

56.     Defendant Gustavo Tardin Barbosa served as CEO and Managing Director of PGF during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

57.    Defendant Alexandre Quintão Fernandes served as CFO and Managing Director of PGF during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

58.    Defendant Marcos Antonio Zacarias served as a Managing Director of PGF during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

59.    Defendant Cornelis Franciscus Jozef Looman served as a Managing Director of PGF during the Relevant Period, and signed the prospectus included in the 2012 Registration Statement.

60.    Defendant Theodore Marshall Helms ("Helms") serves as the authorized U.S. Representative for Petrobras and PGF, and served as the authorized U.S. Representative for PifCo during the Relevant Period.   Helms signed the prospectus included in the 2012 Registration Statement.

61.    The defendants listed in ¶¶50-60 are referred to as the "Officer and Director Defendants."

### 3.    The Underwriter Defendants

62.    Defendant BB Securities Ltd. ("BB Securities") acted as an underwriter and joint bookrunner of the offerings of the 2013 Notes and 2014 Notes as set forth in the table below.  BB Securities is a subsidiary of Banco do Brasil S.A. and is incorporated in the United Kingdom with its principal place of business located in London.  Banco de Brasil S.A. maintains an office in New York City.

63.    Defendant Citigroup Global Markets Inc. ("Citigroup") acted as an underwriter and joint bookrunner of offerings of the 2013 Notes and 2014 Notes as set forth in the table below.  Citigroup maintains its principal place of business in New York City.

64.    Defendant Itaú BBA USA Securities, Inc. ("Itaú") acted as an underwriter and joint bookrunner of the offerings of the 2013 Notes as set forth in the table below. Itaú maintains its principal place of business in New York City.

65.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") acted as an underwriter and joint bookrunner of the offerings of the 2013 Notes and 2014 Notes as set forth in the table below. J.P. Morgan maintains its principal place of business in New York City.

66.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") acted as an underwriter and joint bookrunner of the offerings of the 2013 Notes as set forth in the table below. Morgan Stanley maintains its principal place of business in New York City.

67.    Defendant Mitsubishi UFJ Securities (USA), Inc. ("Mitsubishi") acted as an underwriter and co-manager of the offerings of the 2013 Notes as set forth in the table below. Mitsubishi maintains an office in New York City.

68.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") acted as an underwriter and joint bookrunner of the 2013 Notes offering as set forth in the table below. Merrill Lynch maintains its principal place of business in New York City.

69.    Defendant Standard Chartered Bank ("Standard Chartered") acted as an underwriter and co-manager of the 2013 Notes offering as set forth in the table below. Standard Chartered maintains its principal place of business in the United Kingdom, and maintains an office in New York City.

70.    Defendant Bank of China (Hong Kong) Limited ("Bank of China") acted as an underwriter and joint bookrunner of the 2014 Notes offering as set forth in the table below. Bank of China maintains its principal place of business in Hong Kong, China.

71.     Defendant Banco Bradesco BBI S.A. ("Bradesco") acted as an underwriter and joint bookrunner of the 2014 Notes offering as set forth in the table below.  Bradesco maintains its principal place of business in São Paulo, Brazil, and maintains an office in New York City.

72.     Defendant Banca IMI S.p.A. ("Banca IMI") acted as an underwriter and co-manager of the 2014 Notes offering as set forth in the table below.  Banca IMI maintains its principal place of business in Milan, Italy, and its subsidiary Banca IMI Securities Corporation maintains an office in New York City.

73.     Defendant Scotia Capital (USA) Inc. ("Scotia Capital") acted as an underwriter and co-manager of the 2014 Notes offering as set forth in the table below.  Scotia Capital maintains its principal place of business in New York City.

| Defendant | Role(s) | Offerings |
| --- | --- | --- |
| BB Securities | Underwriter Joint Bookrunner | 2013 Notes 2014 Notes |
| Citigroup | Underwriter Joint Bookrunner | 2013 Notes 2014 Notes |
| Itaú | Underwriter Joint Bookrunner | 2013 Notes |
| J.P. Morgan | Underwriter Joint Bookrunner | 2013 Notes 2014 Notes |
| Morgan Stanley | Underwriter Joint Bookrunner | 2013 Notes |
| Mitsubishi | Underwriter Co-Manager | 2013 Notes |
| Merrill Lynch | Underwriter Joint Bookrunner | 2013 Notes |

| Standard Chartered | Underwriter Co-Manager | 2013 Notes |
|---|---|---|
| Bank of China | Underwriter Joint Bookrunner | 2014 Notes |
| Bradesco | Underwriter Joint Bookrunner | 2014 Notes |
| Banca IMI | Underwriter Co-Manager | 2014 Notes |
| Scotia Capital | Underwriter Co-Manager | 2014 Notes |

74.     The defendants listed in ¶¶62-73 are referred to herein as the "Underwriter Defendants."

75.     Petrobras, PGF, the Officer and Director Defendants, and the Underwriter Defendants are collectively referred to herein as the "Securities Act Defendants."

### C.     EXCHANGE ACT DEFENDANTS

76.     Defendants Foster, Gabrielli and Barbassa (described above in ¶¶49-51) are collectively referred to herein as the "Individual Defendants," and together with defendants Petrobras and PGF, are collectively referred to herein as the "Exchange Act Defendants."

77.     The defendants described above in ¶¶46-76 are collectively referred to herein as the "Defendants."

## V.     JURISDICTION AND VENUE

78.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77(k), 77(1), and 77(t), and Sections 10(b), 18 and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78r and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

79.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18

80.    This Court has personal jurisdiction over each of the Defendants named in this action pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), and/or N.Y. CPLR § 302.  Each of the Defendants either maintains a continuous presence within this District or participated in transactions at issue in this Action within this District.

81.    Venue is proper in this District pursuant to Section 22(a) of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Petrobras maintains an office in this District, sponsors ADS that are listed on an exchange located in this District, and certain of the acts alleged herein, including dissemination of materially false and misleading information to the investing public, occurred in and/or were issued from this District.  All of the registered public offerings at issue in this Action were carried out in this District, 23 debt securities currently outstanding issued by PifCo or PGF are registered with an exchange located in this District, and 19 debt securities issued by PifCo or PGF during the Relevant Period (including the re-opening of two prior issues) are registered with an exchange located in this District.  Furthermore, a number of the Underwriter Defendants are headquartered in this District.

82.    Defendants used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets, in committing the acts complained of herein.

## VI.    SUMMARY OF SUBSTANTIVE ALLEGATIONS

### A.    BACKGROUND OF PETROBRAS

83.    Petrobras is an integrated oil and gas company that is the largest corporation in Brazil, accounting for 12% of the country's gross domestic product.  It is one of the largest companies in Latin America.  It was incorporated in 1953 to conduct the Brazilian federal government's hydrocarbon activities.  Its common and preferred shares have been traded on the

NYSE since 2000 (in the form of ADS).  As of December 31, 2013, the Brazilian federal government owned 50.26% of Petrobras' voting shares.

84.     Petrobras' operations account for the majority of Brazil's oil and gas production. Petrobras operates substantially all of the refining capacity in Brazil, and participates in most aspects of the Brazilian natural gas market.  It also operates in 17 countries in addition to Brazil, including refining operations in the United States.  The Company's activities are organized into six business segments: (1) exploration and production; (2) refining, transportation and marketing; (3) distribution; (4) gas and power; (5) biofuel; and (6) international.

### B.     A BRIBERY SCANDAL ENGULFS PETROBRAS

#### 1.     Operation Car Wash Uncovers An Enormous Bribery And Corruption Scheme Implicating Top Petrobras Officials

85.     In or about July 2013, Brazilian federal police launched a secret operation code-named "*Lava Jato*," or "Car Wash."  Operation Car Wash focused on a scheme involving a career criminal and money launderer named Alberto Youssef ("Youssef"), and was named after a gas station used by Youssef to launder cash.  As the investigation progressed, each new phase was given its own colorful code name, such as "Dolce Vita," "Bidone," "My Way," and "Doomsday," though "Car Wash" is used in the press—and this Complaint—to refer to the total operation.  On or about March 20, 2014, after several months of the Operation Car Wash investigation, Brazilian police arrested Paulo Costa ("Costa"), a director of Petrobras' refining division, based on documentation linking Costa to another person implicated in the money laundering scheme.  When the police raided Costa's home, they found a cache of R$380,000 in Brazilian currency, $181,000 in U.S. currency, a $120,000 SUV, and his diary, in which he had written, "Rooting out corruption is the ultimate goal of those who have not yet come to power."

86.   Costa subsequently agreed to a plea deal from prosecutors, and has testified that he turned Petrobras' refining division into a slush fund for the Workers' Party, a Brazilian political party that has governed at the federal level in a coalition government with several other parties since 2003.  Former Petrobras executive Pedro Barusco ("Barusco") has quantified the amount paid to the Party, testifying before a Brazilian congressional hearing that the Workers' Party received up to $200 million in payments skimmed from Petrobras between 2003 and 2014.

87.   In his testimony, Costa testified that he started inflating budgets for new projects after he was promoted to oversee refining operations nearly a decade ago, accepting bribes equivalent to three percent (3%) of the value of the deals from the Brazilian construction companies that obtained the contracts, and then handing over a portion of the money to the treasurer of the Workers' Party.  He also testified that this practice was widely known at Petrobras, and that different political parties had different fiefdoms within the Company, stating:

> Look, in regard to the Services Department, it was everyone, everyone knew, that they had a percentage of those contracts in the Supply area, of the 3%, 2% was to take care of the [Workers' Party].  Through the Services Department.  Other departments such as gas and energy, and exploration and production, were also [Workers' Party], and then you had [Workers' Party] in the Exploration and Production Department, [Workers' Party] in the Gas and Energy Department, and [Workers' Party] in the service area.  So, the common commentary inside the company was that, in that case, 3% was directly for, directly for the [Workers' Party].  . . . The International Department was designated for the [Brazilian Democratic Movement Party].  So, there were also funds that were kicked back to the [Brazilian Democratic Movement Party] in the International Department.

> \*      \*      \*

> I worked at this company for 35 years, 27 years of my, of my career, was spent in technical and management positions and I never had a blemish on my record during those 27 years.  If there were mistakes – and there were – they started from the time I became a director, due to involvement in groups, political ones, mainly, which, using the Prayer of Saint Francis over there, that it is in giving that you receive.  They used that a lot.  *So, this political involvement that exists, that existed, afterwards when I left, I cannot say, but it was present throughout the executive board of Petrobras, and it is a blemish on the company . . . .*

21

(All emphasis added, unless otherwise noted.)

      88.     Former Petrobras executive Barusco also made clear the pervasiveness of corruption, testifying that he had received bribes from contractors in exchange for inflated contracts as long as 18 years ago.

      89.     In addition to inflating prices by 3% or more, the bribery scheme also effectively eliminated competitive bidding for large Petrobras projects and thereby allowed Petrobras contractors to lock in inflated profits.  A May 8, 2015 BLOOMBERG BUSINESS article entitled "The Betrayal of Brazil" reported that, according to Barusco's testimony, when the cartel met in the São Paulo offices of one of its members, the engineering firm UTC Engenharia, to develop plans to divide up contracts at inflated prices, a representative of Odebrecht S.A. secretly asked Petrobras to restrict bidding to cartel members, and Petrobras formally limited bidding to companies on the list of cartel members.  According to Costa's plea documents, the cartel was formed "with the object of frustrating the effective competitive bidding process for contracting." He further stated that "due to the lack of effective competition [cartel contractor profits] always[] stretch[] to the limit the contracting enterprise allows."

      90.     Petrobras contracting rules considered any contract bid that came between a range of 15% below the basic budget and up to 20% above it to be reasonable.  Due to the existence of the cartel scheme, however, cartel companies were able to routinely set their bids at close to the maximum allowed, as demonstrated by the following exchange in Youssef's testimony.

> Q: [H]ow did these companies arrive at the amounts in the contracts?  Petrobras has a reference value, you know, for contracts.  How did they arrive at this reference amount to not be too much higher or lower?  Do you know about this?
>
> A: Actually, Petrobras works with minus 15 and plus 20%.  They were always within this average.  Whenever they went beyond this limit, the director would call to negotiate.

Q: Did the other companies participate in this negotiation or just the company that had provided the best proposal?

A: Only the company that had provided the best proposal.

Q: This reference value, then, was based on minus 15 or plus 20, didn't the companies know about this?

A: No, they didn't. Each one had to really prepare their quote properly to be able to participate in the . . .

Q: [C]an you tell me whether being in this cartel enabled these companies to set the price in their contracts close to the plus 20%?

A: This is what was discussed with the director, ok? The director called and said: "Look, this is above the price, it has to fit the limits. I want this project to stay within this level." It can be done, it can. It can't be done, it can't. Then he'd call the second.

Q: But the second . . . as a rule, since the list was only negotiated among . . . ?

A: Normally, it never reached the second placed company. Normally, always the first one got it.

Q: So we can conclude that, due to the existence of the cartel, the contracts executed by Petrobras were always executed at the maximum amount possible or close to it?

A: Or close to it.

91.    On April 15, 2014, then-CEO Foster appeared before the Senate of Brazil to offer testimony relating to the Company's 2006 purchase of a refinery in Pasadena and allegations regarding bribery. Petrobras paid $360 million for fifty percent of the refinery, even though its previous owner, Astra Oil, had paid only $42.5 million for it the previous year. Costa has told investigators that he received $1.5 million from a lobbyist to aid in the purchase of the Pasadena refinery. As part of her statement, CEO Foster revealed that Petrobras was conducting a re-evaluation of all contracts in which Costa could have participated.

92.    On or about October 9, 2014, recordings of Costa's testimony were released, in which Costa testified that bribes had been paid in connection with the award of contracts to

Transpetro, a segment of Petrobras, implicating Sergio Machado ("Machado"), who was then the director of Transpetro.  Machado has since requested unpaid leave.

93.     Testimony and documents from contractors connected to the scandal have provided further evidence of the pervasiveness and far reach of the scheme.  For example, according to a November 24, 2014 article in GLOBO, Erton Medeiros Fonseca, a director of the contractor Galvão Engenharia who was arrested in connection with Operation Car Wash, has admitted to Brazilian police that he paid bribes to execute contracts with Petrobras under "effective threat of retaliation against contracts maintained by Galvão Engenharia S/A with Petrobras."  A February 21, 2015 article in VEJA revealed that the president of contractor UTC Engenharia provided the Workers' Party with R$30 million in bribes, including R$10 million given to the re-election campaign of President Dilma Rousseff and over R$2 million in cash given to a former government minister to pay for living expenses.

94.     Petrobras has stated that "the payment scheme involved a group of 27 companies," who were part of a cartel, as well as an undisclosed number of companies outside the cartel that also paid bribes for overpriced contracts.  The Company's Board has imposed a temporary ban on contracts and bids from contractors linked to the scheme.  The blacklist includes some of Brazil's biggest contractors, such as Odebrecht S.A., Camargo Correa S.A., and Andrade Gutierrez S.A.  In December 2014, Brazil's comptroller general initiated cases against eight construction companies with ties to Petrobras.  The comptroller general announced on March 11, 2015, that it had opened cases against ten additional construction firms with Petrobras contracts: Alumini Engenharia S.A., GDK S.A., Promon Engenharia, Andrade Gutierrez, Fidens Engenharia, Sanko Sider, Odebrecht, Odebrecht Óleo e Gás, Odebrecht Ambiental, and SOG Óleo e Gás.  The cases may prevent these companies from signing new contracts and may lead to

fines and other penalties. Youssef has testified that the contractors, "especially the large ones, were hostage to this scheme because either they participated or they won no contracts." In June 2015, Brazilian police arrested the heads of Odebrecht SA and Andrade Gutierrez. After his arrest, Marcelo Odebrecht sent a handwritten note to his lawyers including the instruction, "destroy email drilling rigs."

95.    Multi-national corporations have also been implicated, including SBM Offshore ("SBM"); Maersk; and two Singaporean companies (Keppel Corp. and Sembcorp Marine). According to Barusco, a former executive of ABB, a Swiss engineering group, was responsible for organizing bribes from SBM, Alusa (a Brazilian construction company), and Rolls-Royce (the British corporation) to politicians and Petrobras executives. Barusco admitted that he laundered approximately $100 million in bribes and that he personally received at least $200,000 from Rolls-Royce. A network of Swiss bank accounts was used for some of these illegal payments, according to both Barusco and documents released by a Brazilian court.

96.    Petrobras had previously and repeatedly told investors that it had specifically investigated the SBM contracts and denied "vehemently" that any wrongdoing had occurred. In a May 10, 2014 posting on its *Fatos e Dados* ("Facts and Data") blog, Petrobras stated that the Company "became aware of reports of alleged bribes to employees of the company, involving the firm SBM Offshore," for the first time in February 2014. The Company reiterated this denial in a July 12, 2014 Facts and Data posting, stating, "[i]t must also be stressed that the investigations conducted by SBM Offshore found no evidence of improper payments."

97.    A Brazilian federal court has so far indicted about 40 individuals, including several dozen executives of construction companies, and fourteen persons are in custody while the investigation proceeds. In addition, Brazil's public prosecutor's office has said that it seeks

to investigate 49 politicians in connection with the scandal, including the speakers of both houses of the Brazilian Congress.

<blockquote>

**2.     An Independent Member Of The Petrobras Board Votes Against Approval Of The Company's 2013 Financial Statements**

</blockquote>

98.     Around the time that police began making arrests in the Operation Car Wash scandal, an independent member of the Petrobras Board noticed irregularities in the Company's financial reporting, and specifically its accounting for its refinery projects.  On March 17, 2014, Petrobras issued a press release announcing that the Company's Board had approved the Company's financial statements for 2013 by a majority vote, but also disclosed that:

> Director Mauro Rodrigues da Cunha ["Cunha"] *voted against the approval of the Financial Statements* of Petrobras due to: (i) lack of timely dispatch of the financial statements to the Directors to analyze; (ii) disagreement with the hedge accounting policy; and (iii) *lack of information and apparent accounting inadequacy of refinery investments*.

99.     According to a February 6, 2015 BLOOMBERG BUSINESS article, *Petrobras Independent Board Members Oppose CEO Choice*, Cunha, who was nominated to the Board by international funds, rejected the Company's 2013 earnings report because he was given only a few minutes to evaluate complex documents and because the accounting for refineries was inadequate.  He complained to a Brazilian regulator, writing, "[t]hey are among the world's most expensive refineries. . . .  I'm not comfortable with the absence of impairment."  Although it is not at this time clear whether Cunha thought that impairments were necessary as a result of bribery and corruption-related overcharges or some other factor (such as the significant cost overruns that had occurred), the Abreu e Lima and Comperj refineries whose accounting Cunha objected to were later revealed to be at the center of the corruption scandal.

100.    Cunha was removed by the Petrobras Board from a committee investigating the Pasadena and Abreu e Lima refineries on April 25, 2014, shortly after he raised his objections.

He has lodged a complaint with Brazilian securities regulators questioning his removal and the independence of the committee.

### 3.   The Abreu e Lima Refinery, Comperj Petrochemical Complex And Other Major Projects Are Implicated In The Fraud

101.   Records from the Brazilian Federal Audits Court, which is known as the TCU, show that investigators detected widespread overcharging on contracts and irregular tendering practices at major Petrobras projects (including the Abreu e Lima refinery, the biggest single investment project in Petrobras' history) as early as 2009. In a report that was delivered directly to Petrobras' Board, the TCU reported on these practices, criticized Petrobras for obstructing its investigation by waiting until the last day of the investigation to deliver documents, and recommended stopping construction on the Abreu e Lima refinery until the irregularities were addressed.   The Petrobras Board overruled this recommendation.   Another of the Board's independent members, Silvio Sinedino, who represents Petrobras employees, told BLOOMBERG that, "The board ratifies the decisions previously made by the government. The meetings are too fast, and don't allow for discussions to go deeper." "The government doesn't want oversight," said Sinedino, adding that important financial information on projects is often provided only on the day of meetings and that government officials try to strong-arm the board.

102.   The TCU continued to flag irregularities in reports on the Abreu e Lima refinery for 2010, 2011, 2012, and 2013. The TCU's findings were "a clear warning sign of bigger problems and likely corruption," Saulo Puttini, one of the auditing officials, told REUTERS. "What's happening now is not a surprise to us at all." The Abreu e Lima refinery has reportedly become the most expensive refinery ever built.

103.   On April 22, 2015, the Company announced a $3.4 billion impairment on the Abreu e Lima refinery.   In the minutes to a Petrobras Board meeting held that same day,

27

Petrobras Board member Sinedino noted that, "[b]y the average maximum international cost [Abreu e Lima] should have a cost of US$25 thousand/capacity of refined barrel, and at [Abreu e Lima] we have US$81 thousand/capacity of refined barrel."

104.   The TCU flagged similar problems at the Comperj complex.  On October 8, 2010, FOLHA DE SÃO PAULO reported that the TCU had identified "signs of serious irregularities" in three contracts associated with Comperj, including overpricing, incorrect cost estimates, and anti-economic agreements with contractors.  Petrobras vigorously denied the TCU's findings.

105.   An internal Petrobras audit completed in November 2014 found that starting in April 2010, Petrobras acquired equipment to be used at the Comperj facility prior even to defining the refinery's business model and production structure.  As a result, Petrobras spent over R$1 billion on maintenance of gear that it did not ultimately need.  The Petrobras auditors also found irregularities in a major contract associated with Comperj, whereby three companies linked to the cartel were awarded an R$3.8 billion contract with no public competition.  The audit found that "management failures, planning and coordination issues in the enforcement of the project may have contributed to facilitate the occurrence of eventual criminal actions," linking Costa and other Petrobras executives suspected of criminal conduct to the Comperj contracts.  Costa has said the contracts indicated as irregular by the audit at Comperj were approved by a panel of the Petrobras Board.  On April 22, 2015, the Company announced an $8.2 billion impairment on Comperj.

106.   According to an article in EPOCA, TCU auditors also identified "serious irregularities" in the billing processes and prices at the Presidente Getúlio Vargas Refinery ("Repar") in 2009, and recommended that Congress block payment of works at Repar, Abreu e Lima, Comperj, and another refinery.  This recommendation was approved by Congress but

overruled by the President of Brazil.   In another audit in 2014, the TCU again identified

irregularities and recommended that payment be suspended on seven contracts related to Repar.

107.    During the Relevant Period, however, the Company repeatedly denied the

existence of these irregularities.  Petrobras represented to investors and the public that there were

no irregularities in the contracting for these major projects and that it was in full compliance with

its regulators.   For example, in a January 28, 2010 posting on its Facts and Data blog, the

Company stated that:

> Petrobras reiterates that there are no irregularities in contracts relating to
> construction works at the Abreu e Lima Refinery (PE); modernization and
> adaptation of production at the Presidente Getúlio Vargas Refinery
> (REPAR/Paraná); construction of the Rio de Janeiro Petrochemical Complex
> (COMPERJ/Rio de Janeiro); and construction of the Barra do Riacho Terminal
> (Espírito Santo).   There are differences in the parameters used by TCU and by
> Petrobras, which resulted in different amounts in some contracts for the
> aforementioned works.

*        *        *

> The Company collaborates systematically with oversight bodies, and where there
> are discrepancies, it seeks to clarify them.  This is what it has done in the case of
> these four projects.

108.    The next day, in a January 29, 2010 Facts and Data posting, Petrobras

"reiterate[d] that there was no 'overbilling' or 'overpricing' . . . at the Abreu e Lima refinery

works."

109.    Similarly, on October 8, 2010, in response to media reports that the TCU had

found evidence of overpricing in Petrobras contracts, Petrobras stated on Facts and Data that,

"Petrobras reiterates that there are no irregularities in the Rio de Janeiro Petrochemical Complex

(Comperj). . . . There is no overbilling.  Petrobras reiterates that there are technical discrepancies

between the methodologies used by the company and those used by the TCU."

### 4.   Petrobras' Most Senior Executives Knew Of The Fraud

110.   The persons involved in the fraud were senior executives whose knowledge may be imputed to Petrobras.  Costa was the former director of the Company's refining division, and in a January 9, 2015 cooperation statement he said that, "the Directors of the services, international and supply areas knew for sure the cartelization process[.]"  Barusco was a former high-level manager in the engineering and services division.  In addition, Nestor Cervero ("Cervero"), the former head of Petrobras' distribution subsidiary, has been arrested for corruption and money laundering for alleged crimes committed between 2006 and 2012, and sentenced to five years in prison.  Cervero held various positions at Petrobras and was its international director when the Company purchased the Pasadena Refinery that is believed to be implicated in the corruption scheme.  Jorge Zelada, whose was the director of the international division from 2008 to 2012, has also been arrested.  Prosecutors also are pursuing indictments against former CEO Gabrielli as well as former executive Renato Duque ("Duque") (former director of engineering and services).  Duque stamped, signed and referred to the Petrobras Board at least $2.67 billion in contracts for the Abreu e Lima refinery project at the heart of the investigation.

111.   Other top Petrobras executives also were involved in or otherwise knew of the fraud.  According to a December 12, 2014 article in the newspaper VALOR ECONÔMICO, between 2008 and 2009, former Petrobras executive Venina Velosa da Fonseca ("Velosa") repeatedly warned top Petrobras executives about corrupt acts and irregularities, to no avail.  For example:

      a)    In 2008, when Velosa was working in the Supply department under Costa, she sent CEO Gabrielli a report about suspicious transactions in the Communications department.  Gabrielli established a commission to investigate the case, which found that the Communications department

had received R$58 million for services that it never provided. Nonetheless, the director of Communications remained with the Company for another four years.

b)   In 2009, Velosa emailed Foster (who was then director of Gas and Power) regarding the Abreu e Lima refinery.   Velosa criticized dismissals of contractor bids, and found more than a hundred avoidable cost overruns that had increased the expense of the refinery by almost R$950 million.  In early 2010, she was reassigned to Singapore.

c)   On October 7, 2011, Velosa emailed Foster again about irregularities in the bidding process.  In this email, Velosa stated, "I would like to present part of the documents I have. Part of it, I know you are aware of."

d)   On April 10, 2012, Velosa emailed José Carlos Cosenza, the Company's director of Supply (and who is now the head of an internal commission investigating the implications of Operation Car Wash) notifying him about financial malfeasance in the purchase and sale of a type of fuel for ships, whereby contractors were buying fuel and selling it to Petrobras at higher-than-market-rate prices, as well as not delivering the amounts promised. Velosa da Fonseca estimated that losses could amount to 15% of the value of the oil and fuel cargo in Singapore.   In May 2012, she gave a presentation at Petrobras' Rio de Janeiro offices on this subject.   Since then, Costa has testified that there were bribes paid in connection with the Supply department's contracting of ships.

112.   On November 19, 2014, Petrobras removed Velosa from her position, citing non-compliance with internal rules.  The next day, she wrote again to Foster regarding her ordeal over the past several years, stating, "Since 2008, my life has become a living hell. I found an initial money deviation scheme, within Communication and Supply. While fighting against it, I was threatened and harassed."  She said that she had been intimidated by violence, with a gun pointed at her head and threats made against her daughters.  She said that she has documents that she did not provide to the press out of respect for Petrobras. And she reiterated that she had taken these issues to Company authorities, in vain.

113.   Velosa provided further detail on her whistleblowing efforts in a December 21, 2014 interview with journalist Glória Maria for FANTÁSTICO, a newsmagazine:

Glória Maria – You have testified at the Prosecution Office, and you also provided several documents that would prove irregularities in Petrobras businesses. How long have you been making claims?

Velosa – Since the first time I noticed that there were irregularities in my area. This happened in 2008. Since 2008 I have been making these... I have been reporting problems to my superiors, and now is the peak as I provide this documentation to the Prosecution Office.

Glória Maria – What kind of irregularities you have found in Petrobras' contracts?

Velosa – There are several types. Irregularities in the payment for non-provided services, contracts that were apparently overpriced. Negotiations requesting commissions to people who were negotiating and a series of issues that would breach the code of ethics and procedures of the company.

Glória Maria – What employees, what people in Petrobras, have you informed about these irregularities?

Velosa – All my superiors. I informed the executive manager and up to the president of the company.

Glória Maria – Can you give names?

Velosa – Certainly. Initially, in 2008, as executive manager, I informed the director at the time, Paulo Roberto Costa. I informed other directors, such as Graça Foster. In addition, at a different time, I informed my executive managers,

José Raimundo Brandão Pereira and Abílio, who was my current executive manager. I also informed director Cosenza. He was director and was a colleague, as executive manager. I informed president Gabrielli. I informed everyone I thought that could do something to fight that process that was installing at the company.

The current Petrobras president, Graça Foster, she is a career employee in the company, where she has worked as gas and power director. Graça assumed as president in February 2012.

She replaced Sergio Gabrielli, who had been in this position since July 2005. In Petrobras flowchart, Paulo Roberto Costa appears, as leader of the Supply Department between 2004 and 2012. He signed a plea arrangement to tell what he knows in exchange to a reduction in his penalty. Today, he is under house arrest. The Supply director is currently José Carlos Cosenza. In the same sector, there is another executive manager, Abilio Paulo Pinheiro Ramos.

Another executive manager, José Raimundo Brandão Pereira, was removed in April this year.

Glória Maria – The current Petrobras president, Graça Foster, says that you sent an email, but that she did not understand what it was. Have you presented your claim by email or personally?

Velosa – I was with the president personally when she was gas and power director. At the time, we discussed the subject. I gave her the documents about the claim in the communication area. Afterwards, we... She had access to irregularities at the meetings with the executive directors.

[Velosa showed Fantástico an email she sent to Foster in October 2011]: "I would like to be there, talking to you, looking straight into your eyes so you could feel what I want to say, even if I am at risk of crying in front of you. I will write, even knowing that there is a possibility of you visiting the office of director Paulo Roberto and then having him question me what I was doing in your office. I will talk in the name of the woman that demands respect, and who will fight to the end, so one day my daughters will never say: she got tired, she gave up mid-way."

114.    In a December 12, 2014 Facts and Data posting, Petrobras claimed that it "took all necessary measures to clarify the facts cited in [Velosa's] stories," and touted its internal committees of investigation and internal controls.

115.    Youssef, the smuggler-turned-money-launderer at the center of Operation Car Wash, claims that Brazilian President Dilma Rousseff, who was the chairwoman of the Petrobras

Board from 2003 to 2010, also knew of the kickbacks. He also stated in an October 3, 2014 plea document that:

> [H]e reaffirms that the high levels of government had knowledge; *THAT when asked about the actions of the directors of Petrobras, he explained that the Presidency of the state run company had knowledge of the facts*; THAT he remembers a situation in which there was a given situation [sic] in which there was a given process related to the hiring of marketing services for Petrobras and that it was interrupted due to irregularities; *THAT in one of these "parallel acts," the deponent was given the task of paying these expenses for the participants as a result of a direct order by SERGIO GABRIELLI, then president, who had passed on the order from then Director PAULO ROBERTO COSTA[.]*

116.     During the Relevant Period, Costa, Duque, Cervero, Foster, Barbassa and Gabrielli each sat on Petrobras' Executive Board, which exercised oversight over the Company's most important assets and investments. According to a February 6, 2013 Petrobras Form 6-K, Executive Board meetings were "held twice weekly to focus on the physical and financial monitoring of the principal projects in our investment plan." Furthermore, Petrobras' bylaws indicate that the balance sheets and financial statements which are approved by the Audit Board are "prepared by the Board of Executive Officers."

### 5.     Petrobras Is Subject To Far-Ranging Investigations

117.     On October 27, 2014, Petrobras issued a press release entitled "Internal steps taken by Petrobras in response to 'Lava Jato Operation.'" The Company noted that it was taking certain steps in response to the developing investigation, including:

> [S]ign[ing] contracts with two independent investigation companies, a Brazilian and an American, with the aim of examining the nature, extension and impacts of the actions that might have been performed against the Company in the context of what ha[s] been said by former Director Paulo Roberto Costa. These companies will also analyze correlated facts and circumstances that might have material impact over the Company's business.

118.     Many other investigations in addition to the criminal investigation have been initiated. On November 24, 2014, before the markets opened, Petrobras issued a press release

announcing that the Company was under investigation by the SEC. That same day, news reports circulated that Brazilian police had raided the offices of construction and engineering firms linked to the bribery scheme, seizing documents and carrying out arrests.

119.   On December 16, 2014, Brazilian prosecutors announced that they requested that the bank accounts of Defendant Gabrielli and several other former Petrobras executives be frozen.

120.   Brazil's securities regulator is investigating whether top Petrobras executives breached their fiduciary duties to protect the Company and its investors. While the regulator did not name specific persons, officials with fiduciary duties would include the CEO, CFO, heads of exploration and production, services and engineering and refining and supply, and members of the board of directors.

121.   On January 29, 2015, Brazilian prosecutors asserted that the kickback scheme involved at least $800 million in bribes and other illegal funds, though they expected that figure to grow. As of that date, the investigation had targeted more than 230 businesses and resulted in charges against 86 people, as well as the recovery of about $170 million. Just a few days later, on February 5, 2015, the police conducted "Operation My Way," executing 62 warrants to arrest and question suspects, freeze assets, and seize evidence. As of May 4, 2015, the investigation has led to a total of 97 indictments. Investigators with Brazil's Finance Ministry say that they have identified as much as $17 billion of suspicious activity that may be linked to the scandal.

122.   Prosecutors are currently investigating at least 49 politicians from 6 political parties, including the heads of both houses of Congress and a former energy minister, in connection with the scheme.

123.    Brazilian securities regulators have also announced a separate investigation into whether former Petrobras Board members misled investors regarding Petrobras' fuel pricing policy by approving debt targets as part of Petrobras' 2014-2018 business plan but then forcing the company to pursue a fuel pricing policy that made it unlikely that it would be able to meet those goals.

### C.    PETROBRAS' AUDITOR REFUSES TO APPROVE ITS FINANCIAL STATEMENTS FOR THE THIRD QUARTER OF 2014 DUE TO CONCERNS OVER THE BRIBERY SCHEME

124.    On November 13, 2014, Petrobras disclosed that it would have to delay its earnings results for the third quarter of 2014 because its auditor, PricewaterhouseCoopers ("PwC"), would not approve those statements due to concerns over the impact of the bribery scheme.  In response to this partial disclosure of the inadequacy of Petrobras' internal controls and the unreliability of its financial statements, numerous securities issued by Petrobras, PifCo, and PGF dropped sharply in value.

125.    The very next day, on November 14, 2014, before trading opened, Petrobras disclosed that it would "release its third quarter 2014 financial statements, *without a review by its Independent Auditors*." Petrobras further noted that:

> In light of the ongoing investigations, it is currently not possible for the Company to determine an estimated date for the disclosure of its Quarterly Financial Statements (ITR) for the period ended 09.30.2014, together with the review report issued by the Independent Auditors.

126.    On January 27, 2015, Petrobras released its delayed unaudited financial statements for the third quarter 2014.  The company acknowledged the need to make revisions to fixed asset values in its financial statements to reflect overpayments tied to past misconduct, stating:

> These consolidated interim financial statements and notes to the financial statements have not been reviewed by independent auditors and reflect

management's best judgment in fairly presenting the Company's financial position in light of facts known to management and based on documentation available as of the current date, *except for errors in the carrying amount of certain property, plant and equipment, which could not be corrected by the Company as of the date of these financial statements, as set out in note 3.*

These consolidated interim financial statements have been prepared in accordance with IAS – 34 Interim Financial Reporting, as issued by the International Accounting Standards Board (IASB), *except for the errors mentioned above and further discussed in note 3.*

Petrobras, however, failed to provide any clarity about the magnitude of these error and the adjustments that would be required.

127.    On January 29, 2015, Moody's Investor Service ("Moody's") announced that it was downgrading all Petrobras debt ratings, including a downgrade of the Company's senior unsecured debt to Baa3 from Baa2, stating that, among other things, "[t]he rating actions reflect concerns about corruption investigations and liquidity pressures that might result from delays in delivering audited financial statements[.]" The following month, on February 24, 2015, Moody's announced that it was further downgrading all Petrobras debt ratings, including downgrading the Company's senior unsecured debt to Ba2, which is a speculative grade – commonly known as "junk" – rather than investment grade rating.

### D.    PETROBRAS ADMITS THAT THE BRIBERY SCHEME CAUSED ITS ASSET VALUATIONS TO BE INFLATED

128.    On November 17, 2014, Petrobras hosted a conference call for analysts and investors.  During that call, the Company's CFO, Barbassa, acknowledged that the Company could need to write down asset values to eliminate fraudulently-incurred bribery and corruption-related payments that should not have been capitalized, and admitted that property, plant and equipment ("PP&E") valuations "should not include values, we try not [sic] a fair value for that good or service."  When an analyst asked him how fair value should be calculated, he said,

"Well, the way we see this now, we would deduct from it any amount that could be linked to bribery of any sort, any excess of price that would have been charged."

129.    Also on this call, CEO Foster admitted that, "[y]ou have an obligation to write off from the asset a cost related to corruption. So the asset can give us the best return possible. But still, if there is a cost related to corruption in the value of that asset, even if the asset can pay off that cost, you have an obligation to write off that cost, you have to discount that cost." She stated that:

> In light of the accusations and investigations of [O]peration Car Wash . . . Petrobras is not able to publish its 3Q14 financial statements because these accusations, if found to be true, could potentially affect the Company's financial statements.
>
> A determining fact took place on October 8, 2014, when the depositions of former Downstream Executive Director, Mr. Paulo Roberto Costa, and Mr. Alberto Youssef, in a hearing at the 13th Federal Court of Paraná, revealed information that may lead to possible adjustments in the financial statements of our Company.
>
> Because of these depositions, therefore, *we need more time to make any possible adjustments to the financial statements*. More time is needed as well to gain greater understanding from the ongoing investigations by the independent law firms; and *we need more time as it is fundamentally important to improve our internal controls*.

130.    During the question-and-answer portion of the call, the following exchange occurred between CFO Barbassa, CEO Foster, and an analyst:

> [**Analyst**]: [I]f we suppose[] . . . [BRL] 5 billion of overprice in the construction of [an asset], how would this be recognized in the balance sheet of the Company? What are the main line items that would be impacted?
>
> **CFO Barbassa**: The adjustment that could be impacted if the accusations are proven to be true would refer to adjustments at fair price of the PP&E that was acquired. . . . In this case, *this value should be removed from PP&E line item [adjusted] value* . . . .
>
> *         *         *
>
> **CEO Foster**: As for the amounts that we would be writing down in terms of our results, our official reference are the depositions made in court. This was what

the judges are calling evidence, temporary evidence. So, in this case, we have a schedule of activities, and we have deadlines to each one of these activities.

For example, there is definition of criteria to measure the effects of losses caused by fraud. In here, *in the objective, in material fashion, our reference will be the depositions made so far*, the evidence provided that will be submitted to Petrobras by the federal police. *We will then use this evidence to have our write-downs, and to the write-downs year after year* regarding companies A, B, C or D that we might have contracted.

131.    When Petrobras issued its unaudited financial statements for the third quarter of 2014 on January 27, 2015 (which were incorporated in the Company's Form 6-K filing with the SEC on January 28, 2015).  In this filing, Petrobras admitted that the corruption scandal caused the valuations of its assets to be improperly inflated, and that writedowns reflecting the true value of the assets were both necessary and forthcoming, stating that:

> [T]he Company believes that amounts related to the misconduct by third parties were capitalized as part of the historical cost of its [PP&E] and are still part of their carrying amount.  However, those costs should not have been capitalized. The Company believes it is necessary to correct the amounts related to the misconduct that were capitalized.

Petrobras did not, however, write down its asset valuations or provide investors with an estimate of the size of the forthcoming writedowns.

132.    Under pressure from the chairman of the Board, who is close to Brazil's ruling Workers' Party, Petrobras abandoned an initial decision to include such writedowns in its financial statements for the third quarter of 2014.  After first deciding to take the writedown, the Board reversed itself under pressure from Chairman and former Finance Minister Guido Mantega.  A source in Brazil has told REUTERS that "[e]ssentially the government didn't want the writedowns to be interpreted as totally related to corruption."

133.    Petrobras' January 28, 2015 financial statements contained a letter from CEO Foster concerning the corruption scandal and the overstatement of fixed asset values.  The letter stated in part:

As is widely known, Petrobras is facing a unique moment in its history. In March 2014, the "Operation Lava Jato", triggered by the Brazilian Federal Police to investigate alleged money-laundering crimes, reached Petrobras through the arrest of the company's former Downstream Director, Paulo Roberto Costa, on charges of corruption, embezzlement, among other offenses.

On November 13th, 2014 as a result of the facts and proofs obtained in the "Operation Lava Jato" Petrobras decided to postpone the release of its third quarter 2014 financial results. *In short, the testimonies examined by Petrobras have indicated the commission of unlawful acts, such as cartelization of suppliers and former employees taking bribes, indicating that the payments to such suppliers were improperly recognized as part of the cost of our fixed assets, therefore requiring adjustments.*

Consequently we have concluded that it is impracticable to correctly quantify these improperly recognized values, since the payments were made by external suppliers and cannot be traced back to the company's accounting records.

Given the impracticality of identifying the improper payments correctly, completely and definitely, and the need to rectify this error, Petrobras considered two approaches: (1) the difference between the fair value of each asset appraised, and its book value; (2) the quantification of the price overrun related to illegal practices, using the information, numbers and dates revealed in the testimonials and plea bargaining of the "Operation Lava Jato".

134.   The letter went on to describe the first of these approaches, namely, comparing the appraisal and book values of the assets on the Company's balance sheet.  Significantly, the letter disclosed that approximately *one third* of the Company's fixed assets were based on contracts with companies linked to the bribery scheme:

The appraised assets represent R$ 188.4 billion, or approximately 1/3 of the company's total fixed assets (R$ 597.4 billion) and were based on contracts signed between Petrobras and the companies mentioned in "Operation Lava Jato" from 2004 to April 2012.

The evaluation was carried out by global firms internationally recognized as independent evaluators for 81% of the assets appraised. The analysis of the remaining 19% was conducted by the technical teams of Petrobras, employing full methodological consistency and the same assumptions as the work carried out by the independent evaluators.

However, the maturity acquired throughout this appraisal process demonstrated to us that this methodology was not an adequate proxy for the unlawful values paid, as this adjustment would also include amounts originated from different